IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>SHAYNE CURTIS BAKER,<br><br>Appellant. | No. 86105-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — A jury convicted Shayne Curtis Baker of inter alia two counts of murder in the second degree and three counts of assault in the first degree. Whether he was the assailant was the primary issue at trial. He now argues that the court erred in allowing the jury to consider evidence which inculpated him, namely by admitting various kinds of eyewitness identifications—some made at trial for the first time—and expert testimony which relied on "toolmark identification." Baker also argues that State misconduct deprived him of a fair trial. Because Baker's claims fail under current Washington law, we affirm.

## I.    BACKGROUND

On June 19, 2022, Zachary Monary was shot six times in a parking lot by a person attempting to enter his car. He survived, but is now in a wheelchair and unable to move his legs. Immediately after the shooting, Monary could not

describe the shooter's appearance, but several other witnesses provided the police with their observations of the incident, the shooter, and/or the truck he was seen driving. Police recovered spent cartridge casings at the scene.

The next day, on June 20, 2022, three more men were shot, two fatally. These shootings occurred at a house in Everett, which was frequented by people using illicit substances. Earlier that day, a man named Trenton Wood had been present at the house and met another man who gave him a ride in his blue truck to pick up a lawnmower.

When the two of them returned to the house, a man named Anthony Jolly and the owner of the house, Anthony Burnett, informed Wood they wanted to move the blue truck off of the property because they believed it was stolen. Wood took a picture of the license plate before the three of them approached the driver. Wood asked the driver for the keys, and the driver stated the keys were inside the truck. When Jolly replied they were going to go get them, the driver pulled a gun from his jacket and shot Burnett, Jolly, and Wood in the head, killing Burnett and Jolly. Police later learned that the assailant also shot another man as he fled the house.

Wood survived, as the bullet that struck him in the head ricocheted into his shoulder. He reported that the man who shot him had identified himself as "Shane." Police recovered three cartridge cases and one bullet from inside the house and a fourth casing outside.

As part of their investigation, the police gathered information from people who had witnessed or interacted with the suspected shooter and from sources capturing the whereabouts of the blue vehicle linked to both crime scenes. One

2

witness told the police a man had come to the Everett house on June 20, had introduced himself as Shayne Baker, and had stated that he was 25 years old. A witness had reported that after the shooting on the 19th they saw a truck which had a license plate number matching the vehicle seen at the June 20 shooting driving recklessly.

Police arrested Baker on June 21st in a stolen dark blue Chevy Silverado, with a license plate number linked to the shootings over the prior two days. Law enforcement found a Glock .45 gun under the driver's seat. During an interrogation at the police station, Baker stated that, in the preceding few days, he may have given a man a ride to pick up a lawnmower.

The State charged Baker with two counts of murder in the second degree and three counts of assault in the first degree, as well as the possession of a stolen vehicle. A jury found him guilty as charged. He timely appeals. Amici curiae, Washington Innocence Project and The Innocence Project, filed a brief in support of Baker's appeal.

## II. ANALYSIS

### A. In Court Identifications

Two testifying witnesses identified Baker in the courtroom at trial after they had previously failed to select him from a photomontage viewed shortly after the shooting.[1] Baker and the amici claim the two "first-time-in-court" identifications

---

[1] Specifically, the first witness to identify Baker in court was Wood, the only surviving victim from the June 20th shooting. The next day, he viewed a photomontage of six males including Baker and was instructed he could indicate the shooter was included, not included, or that he was not sure. He stated he "definitely" did not see the shooter, and he concluded: "not here." A year later,

3

constituted suggestive procedures which were unreliable, in violation of his federal and state constitutional right to due process.[2]

We review alleged constitutional due process violations de novo. State v. Mullen, 171 Wn.2d 881, 893, 259 P.3d 158 (2011). Separately, we review claims involving the admission of evidence for an abuse of discretion. See State v. Birch, 151 Wn. App. 504, 514, 213 P.3d 63 (2009) (reviewing the claim that a trial court erred in denying a motion to exclude an in-court identification). Discretion is abused when the trial court's decision is "manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

---

Wood identified Baker during his trial testimony when the State asked if he saw the driver of the blue truck who committed the shooting in the courtroom. After first expressing some hesitation, he then referred to Baker at the defense table by stating, "It sure looks like him to me." He claimed he did not initially identify Baker from the montage he viewed after the shooting because he did not trust the police and had not trusted the accuracy of their photos.

The second witness was Steven Ahrnkiel, who had lived at the house in Everett when the shooting occurred and told police in an interview the same night that he had seen the owner of the blue truck and believed he could recognize him. When he reviewed a montage soon afterward, including Baker among six white men, Ahrnkiel indicated he was not "sure" whether any of them owned the truck and he did not identify Baker. But then, like Wood, he positively identified Baker at trial. He claimed he was able to remember Baker from the day of the crime because he recalled a specific joke they exchanged.

[2] We reject the State's initial argument that Baker's claim is unpreserved. Below, Baker filed a motion requesting the State be forbidden from eliciting any witness identifications in the courtroom because such identifications would be unfairly suggestive and unreliable. Contrary to the State's assertion, he had a standing objection at trial under State v. Powell, 126 Wn.2d 244, 256, 893 P.2d 615 (1995), because the court denied his motion and the record reflects its ruling was final. Thus, Baker need not establish manifest constitutional error, as he did not waive the issue.

Under the due process clause of the Fourteenth Amendment, U.S. CONST. amend. XIV, eyewitness identification evidence must be excluded if it (1) was obtained by an unnecessarily suggestive police procedure and (2) lacks reliability under the totality of circumstances. State v. Derri, 199 Wn.2d 658, 673-74, 511 P.3d 1267 (2022) (citing inter alia, Manson v. Brathwaite, 432 U.S. 98, 114, 97 S. Ct. 2243 (1977)). Impermissible suggestiveness in a procedure, alone, does not constitute a violation of due process, but rather, it must have created "'a *very substantial likelihood* of irreparable misidentification.'" State v. McDonald, 40 Wn. App. 743, 746, 700 P.2d 327 (1985) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)) (emphasis added). In McDonald, this court explained:

> The issue is whether the witness' identification is reliable. Manson v. Brathwaite, 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). If the identification evidence possesses certain indications of reliability, its admission will be permitted despite impermissible suggestiveness. Manson, at 110. The "corrupting effect of the suggestive identification" is to be weighed against factors indicating reliability. Manson, at 114.

Id.

Baker and the amici thoughtfully explain risks attendant to the use of eyewitness identifications made for the first time in court, largely relying on Derri.[3]

---

[3] In Derri, our Supreme Court broadly directed courts to "consider the current scientific understanding of the fallibility of eyewitness identification when deciding suggestiveness and reliability issues under Brathwaite." 199 Wn.2d at 673. It likewise held, "when a trial court uses the Brathwaite test, it must apply relevant, widely accepted modern science on eyewitness identification at each step of the test." Id. at 675. Assessing the three identification procedures challenged in the case, the court held they were all impermissibly suggestive, "for one or more" of the following reasons: not employing a double-blind procedure (meaning, the law enforcement administering the identification knew the suspect's identity), involving multiple exposures to the same suspect, and using a single suspect identification, or "showup." Id. at 685. However, the court continued, "the inquiry does not end

They have not shown, however, that the in-court identifications here were impermissible under Washington law. And we reject the arguments based on the federal right to due process and on Washington's constitution because neither is supported by binding precedent and this court has previously rejected the identical claim.

As to the federal right to due process, Baker concedes that neither the United States nor Washington Supreme Court has ever addressed whether a prosecutor's elicitation of an identification in court amounts to a showup that would implicate that constitutional right. Baker acknowledges that those courts have only "expressly addressed *police-led*, pretrial showups." (Emphasis added.) Instead, Baker offers authority from a sister state, which held an identification made for the first time in court "amounts to an impermissibly suggestive showup." Br. of Appellant at 21-24 (citing State v. Dickson, 322 Conn. 410, 415, 141 A.3d 810 (2016)). He also cites to several federal appellate court decisions, which he claims have held identifications made for the first time in court implicated a defendant's due process rights. Id. at 25 (citing Commonwealth v. Crayton, 470 Mass. 228, 21 N.E.3d 157 (2014); People v. Posey, 512 Mich. 317, 1 N.W.3d 101 (2023); City of Billings v. Nolan, 385 Mont. 190, 383 P.3d 219 (2016); State v. Watson, 254 N.J. 558, 298 A.3d 1049 (2023); U.S. v. Greene, 704 F.3d 298 (4th Cir. 2013); U.S. v.

there." Id. It turned to the second step of the Brathwaite test to assess whether the identifications were so unnecessarily suggestive as to create "'a very substantial likelihood of irreparable misidentification'" under the totality of the circumstances, and it concluded "sufficient indicia of reliability [] outweigh[ed] the suggestiveness of the procedures." Id. at 685-86 (internal quotation marks omitted) (quoting Braithwaite, 432 U.S. at 116).

Rogers, 126 F.3d 655 (5th Cir. 1997); U.S. v. Hill, 967 F.2d 226 (6th Cir. 1992); U.S. v. Rundell, 858 F.2d 425 (8th Cir. 1988)).

None of his arguments persuasively address the fact that this court has previously entertained and rejected the precise argument here, i.e., that an eyewitness identification was unduly suggestive where a witness identified the appellant at trial after previously failing to select him from a montage. State v. Haff, No. 70296-3-I, slip op. at 7 (Wash. Ct. App. Feb. 23, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/702963.pdf.[4]  There, we explained the appellant did not allege improper *police* conduct*,* so his claim was foreclosed by Perry v. New Hampshire, 565 U.S. 228, 248, 132 S. Ct. 716 (2012), which limited such due process claims to law enforcement conduct. Id. at 8.

In Perry, the United States Supreme Court held that "the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." 565 U.S. at 248.  The Court explained that "[w]hen no improper law enforcement activity is involved," other safeguards ensure reliability, including:

> the presence of counsel at postindictment lineups, vigorous cross-examination, protective rules of evidence, and jury instructions on both the fallibility of eyewitness identification and the requirement that guilt be proved beyond a reasonable doubt.

Id. at 233.

As to the state constitutional right to due process, Baker asserts

---

[4] We cite this case, pursuant to GR 14.1, as necessary for a reasoned decision.

Washington's Constitution provides an independent basis for his claim because it is more protective than the federal constitution with regard to eyewitness identifications. However, Haff also rejected the contention. No. 70296-3-I, slip op. at 15. We follow that well-reasoned analysis.

The only binding Washington law to which Baker and the amici cite to support their due process arguments is our Supreme Court's general mandate in Derri to account for modern scientific understandings while assessing identifications under the test from Brathwaite. Baker avers that, because scholarly sources indicate that identifications made for the first time in court are highly suggestive and unreliable, we should conclude they implicate the constitutional right to due process under Derri's directive. For its part, amici argue that we should categorically bar all identifications made for the first time in court because they are highly, unnecessarily suggestive and inherently unreliable, yet retain great sway over jurors.

While our Supreme Court may one day extend Derri in such a way, our current binding authority holds otherwise and the claim fails.

As a result, we review the admission of Wood and Ahrnkiel's identifications as an evidentiary issue, and we further hold that the admission of the identifications was properly within the court's discretion. It was not manifestly unreasonable to deny a motion that lacked binding authority for its central contention, and that was based on argument an unpublished case has rejected. Blackwell, 120 Wn.2d at 830.

What's more, it was reasonable for the court to conclude the reliability of the

8

witnesses' identifications would properly be settled by the jury as it assesses the fact before it and makes credibility determinations including via cross-examination. See Haff, slip op. at 19-20 (noting the rules of evidence provide the necessary and appropriate baseline of reliability in this context.).

Thus, Baker has not shown the court improperly admitted the "first-time in court" identifications from Wood and Ahrnkiel.

B.      Photomontage Identification

Baker next claims the court erred when it denied his motion to suppress and admitted a pretrial identification of Baker made by a witness from a photomontage, which he argues was suggestive and unreliable. We disagree.

1. Additional Facts

Another witness in the State's case at trial, Tahee Sheppard, identified Baker from a photomontage three days after the June 20 shooting, after giving a sworn statement to police the same evening of the crime.

During his initial interaction with police, Sheppard conveyed his observations from that day, as captured in a transcribed interview. He explained he lived in a trailer outside the Everett house and, after he fell asleep earlier in the day from using opiates, had woken up as the shooting occurred. He told police that a "random guy" had shown up at the house that day and described him by saying, "I can hardly remember . . . just average, like white kid, like, my age, I believe, something like that, you know." He continued, "I'm still not quite sure who he was. And I briefly met him. Um, . . . I didn't even look, look at him because I was on the nod[,]" which means going between a state of consciousness and

9

unconsciousness. He stated that, when he woke up from his nap to the shooting, he was "confused as hell" and "dazed and confused."

When he was asked what the man he met looked like, he answered, "Kinda like Ashton Kutcher," and continued, "I mean, that's the way I can describe him, just, uh, maybe not as . . . handsome." He again described him as about his same age (25), and stated he drove a truck that was either black or navy blue. Asked if he had any further conversation with him, he answered, "No. No. It was, it was real brief." And when asked if he could identify him by photo, he answered, "Uh probably. Oh, no, 'cause, uh, I don't know. I don't think so." Sheppard then stated the last time he had seen the man was before he took his nap, and the man was going to pick up a lawnmower in the early afternoon. In response to the question whether any clothing item the man wore stood out, Sheppard answered that he was wearing "cowboy boots," specifying, "like…rounded toe" or "like, work boot cowboy boots." Asked if he saw him leave the scene, he said, "Um, no. I, I have not seen him at that point." But he said he had heard a car speed up and "subliminally I heard shots." He commented in general, "I'm an observer you know, I just sit back and watch."

Because the administration of Sheppard's montage several days later was not recorded, the only evidence before the court about how it was administered was the testimony of a detective at a pretrial hearing on Baker's motion to suppress Sheppard's identification. Detective Alex Helphrey explained three days after Sheppard gave his statement, he and another detective, Brenneman, were looking for Sheppard to have him view a photomontage including the suspect in their

10

investigation. They found Sheppard at a pharmacy, and rather than transport him to the police station, they administered the montage identification inside their police truck, after he commented he did not want to be seen as a snitch. Sheppard sat in the passenger seat while the two detectives sat next to and behind him.

The officers handed him a blank envelope which included instructions for the identification procedure but did not read him the instructions due to "fear of any perceived indication." They advised Sheppard the instructions were there for him to read before looking at the photos. The montage included Baker's booking photo. The procedure was not administered in a double-blind manner, as Helphrey indicated he knew Baker was the suspect at the time. But Helphrey testified that neither he nor Brenneman said anything while Sheppard looked at the montage or after he completed it. Helphrey further testified that he believed that Sheppard had looked at the instruction page before viewing the photos. Helphrey then testified that Sheppard began to examine the photos and stated aloud, "You got him," pointing to Baker's booking photo. Finally, Helphrey reiterated that neither officer had mentioned they had a person in custody.

Baker moved to suppress Sheppard's identification pursuant to CrR 3.6. but the court denied his request, entering findings of fact and conclusions of law. It determined that, regardless of whether or not Baker had established the identification was suggestive, there were sufficient countervailing indicia of reliability which meant it did not need to be suppressed to preserve his due process rights.[5]

---

[5] Baker later renewed his motion to suppress Sheppard's identification in an oral

11

2. Law

In reviewing the denial of a CrR 3.6 suppression motion, we review a trial court's findings of fact for substantial evidence and its conclusions of law de novo. Derri, 199 Wn.2d at 676. If an identification is deemed impermissibly suggestive so as to implicate due process, we weigh its suggestiveness against the totality of the circumstances to assess reliability, using a number of factors. McDonald, 40 Wn. App. at 746. These "Biggers" factors include:

> [1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and [5] the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199-200, 93 S. Ct. 375 (1972).

In Derri, our Supreme Court "emphasize[d] that the [above, five] Biggers factors are not exclusive" and directed that courts must consider scientific evidence concerning the reliability of eyewitness identifications while reviewing each factor. Derri, 199 Wn.2d at 686. Helpfully, it set out a number of relevant "estimator variables" for each factor. Id. at 686 n.23. This term refers to environmental or

---

colloquy at trial, asserting its investigator had interviewed Sheppard and obtained new information suggesting, inter alia, he had spoken to other witnesses about the crime and seen news coverage of it. But the interview was not recorded or transcribed, and when the court asked for more information, including whether Sheppard had seen Baker's face in the news coverage, defense counsel did not have any more information. Their account of Sheppard's interview also did not make clear whether he had seen coverage *before* viewing the montage, nor did defense assert there was evidence Sheppard had discussed the shooter's physical appearance with any other witness. The court decided it would not revisit its earlier ruling, finding, "Based on the representations of counsel, the Court hasn't heard sufficient information that would justify the exclusion of the photo montage due to a substantial likelihood of misidentification."

individual variables that are capable of affecting an eyewitness's ability to perceive and remember an event.  Id. at 676.

As to the first Biggers factor, a witness's opportunity to view a suspect at the time of a crime, the court explained we should account for the duration of a witness's observation, as well as facts indicating distance and lighting conditions. Id. at 686-87.

In assessing the second factor, a witness's degree of attention, it noted studies have shown high degrees of stress impair, rather than improve, a person's ability to remember.  Id. at 687.  But it explained it deemed it favorable for purposes of reliability that several witnesses in the case had been able to provide a detailed description of the suspect, including his facial features, in *spite* of the stressful nature of the alleged crime.  Id.

As to the third factor, the accuracy of a witness's prior description of a suspect, the court held we should only weigh any *differences* between a witness's initial description and subsequent selection as a reason to question reliability.  Id. at 687-88.  Because of the fallibility of memory, it concluded we should afford little weight to this factor otherwise.  Id. at 688.

As to the fourth factor, a witness's level of certainty at the time of an identification procedure, it similarly held that while a *low* level of certainty always weighs against reliability, high levels of certainty should be given less weight because suggestive procedures (such as the failure to administer procedures double-blind) can artificially inflate a witness's supposed confidence.  Id. at 688-89.

Finally, when considering the final factor, the length of time between a crime and a witness identification, the Court noted memory only deteriorates over time and never improves, so it held this factor indicates reliability most strongly in identifications made immediately after a crime. Id.

In addition to providing this guidance for assessing the Biggers factors, our Supreme Court held that courts should consider additional estimator variables as part of the totality of the circumstances "[w]here relevant[.]" Derri, 199 Wn.2d at 689. Four are relevant here. The first is "cowitness suggestion," because suggestive behavior by cowitnesses could cause a person to form a false memory of details they never actually observed. Id. 689-90 n.26. The remaining three pertinent "estimator variables" with the potential to lower the total indicia of reliability account for whether the witness (1) observed the suspect in the presence of a weapon, (2) was intoxicated, or (3) was asked to identify a suspect of a different race. Id. at 686 n.23.

3. Discussion

As explained herein, we conclude there was substantial evidence for the court's factual findings it made in denying Baker's motion to suppress and that it did not err in its legal determinations as to reliability.

The court concluded Baker did not meet his burden to show the identification procedure was unnecessarily suggestive, after making findings of fact based on the evidence. Specifically, it noted (1) Sheppard looked at the montage inside a police car after the detectives found him at a Walgreens and he agreed to look at some photos, (2) he was provided with the montage and an

instruction form; (3) a double-blind administration was not utilized; but (4) one of the detectives testified that Sheppard appeared to review the instructions and to his knowledge, had not viewed a photograph of the suspect prior to making the identification or been told "anything related to what law enforcement knew or whether they had a particular suspect in mind[.]"  This is an accurate recitation of the testimony detailed above and, thus, we hold there was substantial evidence in the record to support these factual findings.

The trial court went on to assess overall reliability out of an abundance of caution, even though it determined Baker had not met the burden to prove unnecessary suggestiveness, because it found there was *some* "reason to be concerned about suggestive procedure."  Namely, it noted it was not best practice to conduct the procedure single-blind and no third-party testimony or evidence existed to contextualize the impact of the single procedure or otherwise provide oversight.  The court reasoned, since there was no police video or transcript documenting the identification made in the police car, it could not know for sure whether there had been any suggestive behavior like eye contact between the detectives and Sheppard.

Whether or not Baker adduced sufficient evidence to establish the procedure was unnecessarily suggestive,[6] we proceed to assess the overall indicia

---

[6] Baker claims there is more than sufficient evidence to show impermissible suggestiveness in the record because the procedure was not administered in a double-blind fashion and because the detectives remained in the car with Sheppard.  However, Derri did not hold that the presence of officers during a single-blind procedure automatically makes it unnecessarily suggestive.  Derri, 199 Wn.2d at 681.  Rather, while assessing the suggestiveness of the single-blind procedures at issue, it noted the administering officers had engaged in

15

of reliability de novo.

As to the first Biggers factor—the opportunity to view the suspect at the time of the crime—the trial court opined the timeline regarding Sheppard's observation the day of the shootings was "muddled[.]" We agree Sheppard's answers in his sworn statement to police are far from clear as to exactly when and for how long he saw the suspect. However, his statements did demonstrate he interacted with the suspect for *some* period of time that day and may have even seen him more than once. That is because he reported he briefly "met" the suspect, he was able to name a specific clothing item and celebrity look-alike in addition to describing his general appearance, he approximated the color of his truck, and he indicated seeing the suspect before he went to retrieve the lawnmower. Moreover, lighting and distance variables tend to favor reliability, since whatever brief meeting occurred would have taken place during the daytime and involved some level of interpersonal proximity. See Derri, 199 Wn.2d at 686-87.

As to the second factor—the degree of attention, Sheppard stated the suspect was a white man his same age and wore "rounded toe" cowboy boots, and also described him as a less handsome version of a specific person, Ashton Kutcher. It favors reliability that he was able to provide this relatively detailed description, which arguably included some reference to the suspect's facial features, *in spite of* the stressful nature of the shootings. See id. at 687.

As to the third factor—the accuracy of his description of the suspect, we

---

contemporaneous discussion of photographs with the witnesses, and an officer had made a statement after a witness made a selection that implied "unconscious confidence bolstering." Id. at 681-82.

conclude it bears little determinative weight, since Sheppard's initial description did not differ from his montage selection.  See id. at 687-88.

As to the fourth factor regarding certainty, Derri stressed that certainty does not always correlate with accuracy and held we should not afford a witness's certainty any weight "where it has already been determined that the procedure employed was suggestive."  Id. at 688.  But, here, the extent of possible suggestiveness is not clear.  With no proof in the record Sheppard received information from the detectives to influence his selection, the fact that he expressed some certainty (stating, "you got him" before making the selection) leans slightly in favor of reliability.

As to the fifth factor regarding timing, Sheppard made the identification from the photomontage just three days after the crime, so this favors reliability, see id. at 688, which Baker concedes.

As to the additional factors addressed in Derri, Baker claims Sheppard discussed the shooting with Ahrnkiel, which his counsel alleged for the first time at trial.  However, as the court found, there is no competent evidence in the record to support this claim.[7]

The final three additional factors also do not serve to render the

---

[7] The appellant in Derri also claimed witness suggestion had reduced reliability in the case.  199 Wn.2d at 689-90 n.26.  Our Supreme Court rejected this argument, explaining, "if it *had* been established" that a co-witness had seen the photo before the montage, that would have weighed against reliability.  Id.  But it stated it was the movant's burden to establish the merit of their suppression motion, and therefore it held, "[o]n this record, we cannot say the trial court erred in declining to consider the alleged cowitness suggestion."  Id.

identification unreliable in its totality. First, in his statement to police, Sheppard did not indicate he had observed the suspect in the presence of a weapon, so this factor does not render the identification any less reliable. Second, although he was certainly intoxicated for some of the day and made comments in his initial interview indicating he lacked sustained focus throughout the day, it is not clear from the record he was impaired during the specific periods he observed the suspect. There is also no allegation he was intoxicated at the time he viewed the montage. Third, Baker notes Sheppard is Native American, meaning he was asked to identify a suspect of a different race, since Baker is white. However, he does not identify legal support for the idea that a cross-racial identification in which a Native American witness is asked to identify a white suspect poses such a significant risk that it outweighs other indicia of reliability. Our Supreme Court has indicated to the contrary. See State v. Allen, 176 Wn.2d 611, 637, 294 P.3d 679 (2013) (Wiggins, J., dissenting) (noting "a cross-racial identification of a black suspect by a white victim[] [is] the racial combination accounting for most identification errors.").

Weighing any potential suggestiveness against all of the foregoing factors gauging reliability, we conclude the facts do not suggest there was such an absence of reliability to create "'a *very substantial likelihood* of irreparable misidentification.'" McDonald, 40 Wn. App. at 746 (quoting Simmons, 390 U.S. at 384). Therefore, the court did not err by denying Baker's motion to suppress and admitting Sheppard's identification.

C.     Toolmark Identification Testimony

Baker and the amici also claim the court erred by admitting testimony from the State's firearm expert who offered the opinion the recovered ballistics matched the recovered firearm, based on the Association of Firearm and Tool Mark Examiners' Toolmark Identification (AFTE). We again disagree.

1. Additional Facts

Pretrial, Baker filed a motion asking the court to exclude or limit the testimony from an expert the State planned to call as to the recovered firearm and ballistics in the case, under Frye v. United States, ER 702, and ER 403. 293 F. 1013 (D.C. Cir. 1923). Baker argued the "toolmark identification" method which is used for ballistics comparison was *not* generally accepted in the relevant scientific community under the test in Frye, based upon three landmark reports from scientists in 2008, 2009, and 2016. Baker asserted these reports represented a significant dispute over the validity of such evidence, and also contended this dispute had been "considerably sharpened" by a recent 2020 FBI report.

In addition, in his trial memorandum and motions in limine, Baker requested the court limit the expert's testimony to the opinion that the recovered casings and bullet could not be *excluded* as originating from the recovered firearm, rather than permit her to opine the ballistics and firearm *matched*. Stated differently, Baker moved the court to order the expert be allowed to conclude only that "she cannot eliminate the seized firearm as the possible firearm used at the various scenes [in] this case."

The court denied Baker's request for a Frye hearing based upon its understanding of current Washington law. It also denied Baker's motion to limit

19

the expert's opinion testimony, stating it would allow the jury to assess its weight against countervailing testimony expected from a defense expert. It later denied a renewed motion Baker filed to limit the State's expert's testimony and explained it "[did] not find that the caselaw in Washington requires a limitation on the expert's testimony. Particularly, when there is such a ripe basis for cross-examination and impeachment[.]"

At trial, the State's expert testified that the gun which the police found in Baker's blue truck had fired the bullets and casings recovered from the shootings. Specifically, her testimony concluded that based on having used "toolmark identification," the casings and bullets from both crime scenes "were *identified* as having been fired in the Glock pistol" recovered from Baker's truck. (Emphasis added.)

2. Law

Washington courts use the test outlined in Frye to evaluate scientific evidence for admissibility. State v. Gregory, 158 Wn.2d 759, 829, 147 P.3d 1201 (2006), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). To admit evidence under Frye, the trial court must find that the underlying scientific theory and the "techniques, experiments, or studies utilizing that theory" are generally accepted in the relevant scientific community and capable of producing reliable results. Lakey v. Puget Sound Energy, Inc., 176 Wn.2d 909, 918, 296 P.3d 860 (2013) (internal quotation marks omitted) (quoting Anderson v. Akzo Nobel Coatings, Inc., 172 Wn.2d 593, 603, 260 P.3d 857 (2011)). We review a trial court's determination as to whether to hold a Frye

hearing de novo. Gregory, 158 Wn.2d at 830.

Our Supreme Court has remarked, "[o]nce this court has made a determination that the Frye test is met as to a specific novel scientific theory or principle, trial courts can generally rely upon that determination as settling such theory's admissibility in future cases." State v. Cauthron, 120 Wn.2d 879, 888 n.3, 846 P.2d 502 (1993), overruled in part on other grounds by State v. Buckner, 133 Wn.2d 63, 941 P.2d 667 (1997). Only if a party produces new evidence seriously questioning the continued general acceptance of a given theory must a trial court still undertake a Frye analysis. Id. Relatedly, in Lakey, our Supreme Court rejected an appellant's argument that a scientific methodology he challenged was unreliable based on a review of new studies, and it held the studies did not implicate Frye. 176 Wn.2d at 920. And, critically, in 2019, this court expressly rejected the claim that AFTE ballistics identification methodology failed to satisfy Frye's standard for admissibility. State v. Castro DeJesus, 7 Wn. App. 2d 849, 865, 436 P.3d 834 (2019).

If a particular scientific methodology has been determined to be generally accepted in the community under Frye, "application of the science to a particular case is a matter of weight and admissibility under ER 702." Gregory, 158 Wn.2d at 829.

Under ER 702, the trial court may allow an expert witness to testify in the form of an opinion concerning "scientific, technical, or other specialized knowledge" if the witness is qualified as an expert and the testimony is helpful to the finder of fact. State v. Groth, 163 Wn. App. 548, 561, 261 P.3d 183 (2011).

Testimony is helpful to the fact finder "'if it concerns matters beyond the common knowledge of the average layperson and is not misleading.'" State v. Morales, 196 Wn. App. 106, 122-23, 383 P.3d 539 (2016) (quoting Groth, 163 Wn. App. at 564). Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. Groth, 163 Wn. App. at 564.

In considering the admission of expert opinion testimony under the rules of evidence, "[i]t is the proper function of the trial court to scrutinize the expert's underlying information and determine whether it is sufficient to form an opinion on the relevant issue." Johnston-Forbes v. Matsunaga, 181 Wn.2d 346, 357, 333 P.3d 388 (2014). Thus, "[b]efore allowing an expert to render an opinion, the trial court must find that there is an adequate foundation so that an opinion is not mere speculation, conjecture, or misleading." Id. However, "trial courts are given broad discretion to determine the circumstances under which expert testimony will be allowed." Id. at 354.

According to related evidence rule, ER 403, otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Trial courts likewise have "considerable discretion to consider the relevancy of evidence and to balance 'the probative value of the evidence against its possible prejudicial impact.'" State v. Barry, 184 Wn. App. 790, 801, 339 P.3d 200 (2014) (quoting State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987)).

22

We review a trial court's determination as to the admissibility of evidence for abuse of discretion. State v. Roberts, 32 Wn. App. 2d 571, 599, 553 P.3d 1122 (2024). Again, discretion is abused when the trial court's decision is manifestly unreasonable, or exercised on untenable grounds or for untenable reasons. Blackwell, 120 Wn.2d at 830. It is "[t]he party challenging an evidentiary ruling [who] bears the burden of proving the trial court abused its discretion." State v. Briejer, 172 Wn. App. 209, 223, 289 P.3d 698 (2012).

3. Discussion

As to Frye, Baker argues that Castro DeJesus does not bind this court because its holding did not address the *scope* of the scientific community's general agreement on toolmark identification evidence. And he notes that since the opinion, the aforementioned study published in 2020 had continued to question the propriety of broad reliance on the methodology. He also points to numerous cases from other jurisdictions which he argues serve to clarify the scientific community agrees only as to a particular accepted *use* of toolmark-identification evidence. He asserts the relevant scientific community agrees toolmark examination can be used to reach opinions about *class characteristics* to be matched with certain firearm *makes and models,* but that it cannot be used to make *individual* matches between firearm and ballistics.

These thoughtful arguments could serve as persuasive support for a request to limit the *scope* of a toolmark examiner's opinion testimony under the rules of evidence, discussed further infra. But for purposes of reviewing whether the court erred by denying a hearing or exclusion under Frye, Baker simply does

23

not sufficiently distinguish Castro DeJesus.[8]

Though Castro DeJesus did not consider the subsequently published 2020 report, it did address the other three studies critiquing toolmark methodology, and it disagreed they provided a sufficient basis to support the same general argument Baker advances.  7 Wn. App. 2d at 863-64.  It is doubtful the 2020 report alone suffices as "new evidence which seriously questions the continued general acceptance" of the theory of toolmark identification, Cauthron, 120 Wn.2d at 888 n.3, given that our Supreme Court rejected the contention Frye was implicated by new studies which an appellant relied upon.  Lakey, 176 Wn.2d at 920.

The recent trend from other jurisdictions to limit the scope of permissible toolmark evidence, which Baker and the amicus brief both examine, may provide reason for our Supreme Court to revisit the question of the methodology's general acceptance.  But under current binding law, Baker has simply not shown toolmark identification writ large is not "generally accepted" such that the court was required to hold a hearing on admissibility or exclude the examiner's testimony under Frye.

Baker also argues the court erred under ER 702 and 403 by declining to limit the scope of the opinion testimony the toolmark examiner was permitted to offer the jury, if not exclude it in its entirety.  Baker, however, has not established it was manifestly unreasonable for the court *not* to limit the expert's testimony.

---

[8] Moreover, as the State noted in a Statement of Additional Authority, this court recently continued to adhere to Castro DeJesus's determination that toolmark identification is generally accepted under Frye.  State v. Phillips, No. 85658-8-I, slip op. at 20 (Wash. Ct. App. Sep. 15, 2025) (unpublished), https://www.courts.wa.gov/opinions/pdf/856588.pdf, which we cite to as necessary for a reasoned opinion under GR 14.1(c).

Indeed, in making the decision not to exclude or limit it, the court was correct in reasoning no Washington law required it to do so. Baker has simply not established the trial court abused its considerable discretion under the evidence rules, in ruling as it did.[9]

D.        Prosecutorial Misconduct During the State's Closing Argument

Baker next claims the State committed misconduct during closing argument by misrepresenting the evidence, specifically misstating a key fact. We again disagree.

Generally, the State has wide latitude in drawing and expressing reasonable inferences from the evidence. State v. Rodriguez-Perez, 1 Wn. App. 2d 448, 458, 406 P.3d 658 (2017). To establish prosecutorial misconduct, the defendant has the burden of showing (1) the State acted improperly, and (2) the State's improper act prejudiced the defendant. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Misconduct is deemed to be prejudicial if there is a substantial likelihood it affected the verdict. Id. at 760.

If a defendant does not object to a remark during closing argument, they can only prevail on the issue of prosecutorial misconduct if the remark was so flagrant and ill-intentioned that "it evince[d] an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." State v. Stenson, 132 Wn.2d 668, 718-19, 940 P.2d 1239 (1997). Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any

---

[9] Since we conclude the court did not err in admitting the expert's toolmark identification testimony, we do not reach Baker's specific arguments about prejudice.

prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. Emery, 174 Wn.2d at 761.

Here, in reviewing numerous pieces of identity-related evidence during closing argument, the State claimed Baker "admit[ted]" during his interrogation that "Trent Wood [was] the homey that he took to get the lawnmower[.]" The State does not dispute that Baker made no such admission. But, the State argues that, as Baker failed to object, he must show the prosecutor's passing comment is so flagrant and ill-intentioned that it could not have been cured by an instruction. We agree with the State.

Baker does meet the heightened burden required to merit reversal. He does show the jury could not have been cured by a jury instruction. In fact, it *was* instructed it "must disregard any remark, statement, or argument that is not supported by the evidence." And Baker cannot show the inaccurate assertion he named Wood during his interrogation affected the outcome of his trial and, ultimately, the convoluted facts underlying this statement were far from the only evidence the State adduced tying him to the shootings.[10]

---

[10] Finally, Baker argues cumulative error, asserting that we should reverse his convictions even if we find any of his claimed errors harmless in isolation, based on their prejudicial effect "in the aggregate." The combined effect of an accumulation of errors may indeed require a new trial even if none independently justifies reversal standing alone. State v. Badda, 63 Wn.2d 176, 183, 385 P.2d 859 (1963). However, a defendant must prove the existence of multiple errors to establish that their cumulative effect necessitates reversal. See State v. Clark, 187 Wn.2d 641, 649, 389 P.3d 462 (2017). Since Baker has not adduced binding authority to prevail on any of his claimed errors, he does not merit relief under this doctrine.

### III.    CONCLUSION

We affirm.

Díaz, J.

WE CONCUR:

Chung, J.